# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

              Plaintiff,

v.

(1) Manuel Denis Martinez, and
(2) Gabriel Eduardo Lemoine,

          Defendants.

Crim. No. 22-86 (PJS/BRT)

**REPORT AND RECOMMENDATION**

---

Thomas M. Hollenhorst, Esq., Assistant United States Attorney, counsel for Plaintiff.

Jennifer Rose Congdon, Esq., Congdon Law, PLLC, counsel for Defendant Martinez.

Catherine L. Turner, Esq., Attorney at Law, counsel for Defendant Lemoine.

---

BECKY R. THORSON, United States Magistrate Judge.

On May 17, 2022, Defendants Manuel Denis Martinez and Gabriel Eduardo Lemoine were indicted on one count of conspiracy to distribute methamphetamine and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; one count of distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2; two counts of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2; and one count of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. (Doc. No. 1, Indictment.) This matter is before the Court on the following motions:

- Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 44);

- Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of a Tracking Device (Doc. No. 45);

- Defendant Lemoine's Motion for *Franks* Hearing (Doc. No. 46);

- Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of Searches Pursuant to Warrant (Doc. No. 47);

- Defendant Martinez's Motion for Hearing Pursuant to *Franks v. Delaware* (Doc. No. 53);

- Defendant Martinez's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 56);

- Defendant Martinez's Motion to Suppress Evidence Obtained after Execution of Search Warrants (Doc. No. 60); and

- Defendant Martinez's Motion for Suppression of Evidence Obtained in Violation of the Fourth Amendment of the United States Constitution (Doc. No. 61).

Through these motions, Defendants seek to suppress the evidence obtained from a vehicle tracker device, three ion scans, and the searches of two residences and two storage units.

A hearing was held on the motions on September 2, 2022, whereby testimony was received by Special Agent Jacob Henkemeyer from Homeland Security Investigations ("HSI")[1] and eighteen exhibits were admitted. (Doc. Nos. 74, 75.) The Court ordered post-hearing briefing, which was received from Defendants on October 2 and 3, 2022

---

[1]    Agent Henkemeyer has been employed by HSI since October 2016 and is currently assigned to investigate illicit drug trafficking. (Doc. No. 78, 9/2/22 Hr'g Tr. ("Tr.") 11–12.)

(Doc. Nos. 81, 82, 83, 84, 86, 87, 88, 89), and from the Government on October 17, 2022. (Doc. No. 91.)

The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons set forth below, this Court recommends that Defendant Lemoine's and Defendant Martinez's motions be denied.

## BACKGROUND

In February 2022, law enforcement received information from a confidential informant ("CI") relating to the distribution of methamphetamine, cocaine, and marijuana within the City of St. Paul, Minnesota, and the surrounding metropolitan areas. The CI told law enforcement that they were an acquaintance of two members[2] of the illegal narcotics organization and provided details about current and past operations, much of which was corroborated by law enforcement. (Doc. No. 75, Jt. Ex. List, Gov't Ex. 2.) The CI then set up a meeting with the two men at Keyes Cafe in St. Paul, whose identities at that time were unknown to law enforcement, and provided information to law enforcement that the men would likely be driving a blue Jeep Liberty with a certain license plate number. (Gov't Ex. 1; Tr. 14–15, 76–77.) The purpose of this meeting was to set up a purchase of methamphetamine. (Tr. 15–16.) The initial meeting was surveilled

---

[2]    The CI referred to one of these people as "Nephew," who was later identified as Martinez. (Tr. 13–14.)

by law enforcement and took place as expected,[3] however, the men did not arrive in a Jeep Liberty, but in a gold Chevy Tahoe instead. (Gov't Ex. 2; Tr. 15, 85.) Before this initial meeting, law enforcement sought and received a warrant to place a GPS tracking device on the blue Jeep Liberty. (Gov't Ex. 1.)

On March 3, 2022, several law enforcement officers surveilled a second scheduled meeting at an Applebee's in Woodbury, Minnesota, where the CI met with the two men. (Tr. 15–17.) Officers observed a drug transaction take place during the second meeting; after the transaction, the CI turned over to the officers approximately one pound of methamphetamine that he obtained from the two men. (Tr. 18–19.) For the second meeting, the two men came and left in the same gold Chevy Tahoe that they were seen in the day before.[4] (Tr. 15, 17, 85.)

When the men left the scene, agents followed them to a gas station and then to an apartment complex in Burnsville. (Tr. 19, 74, 86.) After the two men went inside the apartment complex, Agent Henkemeyer went inside the complex to speak to an apartment manager. (Tr. 19.) While inside the management office, Agent Henkemeyer

---

[3]    Special Agent Jacob Henkemeyer testified that the first meeting occurred on February 25, 2022. (Doc. No. 14.) The Government represents in its post-hearing brief that Special Agent Henkemeyer must have misspoken because after reviewing the police reports and search warrant affidavits, it is apparent that the first meeting took place on March 2, 2022. (Doc. No. 91, Gov'ts Post-Hr'g Memo. in Opp'n to Defense Mots. ("Gov'ts Mem.") 3 n.1.) Whether the first meeting took place on February 25 or March 2 has no bearing on the outcome of Defendants' motions.

[4]    Law enforcement had not yet placed a GPS tracking device on the blue Jeep Liberty pursuant to the warrant they had received.

observed the two men come into the office to pay rent. (Tr. 20–21, 75, 86–87.) After the two men left, the office manager identified Gabriel Lemoine by name and recognized the second man as Mr. Martinez. (Tr. 20–21, 75.)

At approximately 5:00 p.m., while Agent Henkemeyer and the two men were inside the apartment complex, Officer Gleason of the St. Paul Police Department installed a GPS tracking device on the bottom of the gold Chevy Tahoe.[5] (Tr. 22.) It is undisputed that at that time, the officers did not have a warrant to place the tracking device on the gold Chevy Tahoe.[6] After the GPS device was installed, Sergeant Thomas Weinzettel of the St. Paul Police Department drafted a search warrant application and affidavit for the installation and monitoring of a GPS device on the gold Chevy Tahoe, and submitted it to a Dakota County Judge, who signed the warrant at 7:42 p.m. (Gov't Ex. 2.) It is undisputed that the GPS tracker was active on the vehicle when it was placed on the vehicle at 5:00 p.m. on March 3, 2022,[7] but that no actual data was retrieved by officers

---

[5]    Agent Henkemeyer testified that the GPS tracking device was a magnetic device that was physically attached to a metal part on the underside of the vehicle, and that it took only a matter of seconds to install. (Tr. 17, 24, 85–86.)

[6]    Again, at that time, law enforcement had a signed warrant for a GPS tracking device on the blue Jeep Liberty, but the suspects were not observed driving a blue Jeep Liberty on March 2 and 3, 2022, but a gold Chevy Tahoe instead.

[7]    The GPS tracker remained active from March 3, 2022, through April 21, 2022, except for a couple of minutes on April 14, 2022, when law enforcement swapped devices on the vehicle due the low battery on the original device. (Tr. 42.)

from the system that recorded the GPS data until 10:32 p.m. later that night.[8] (Gov't Ex. 12; Tr. 33.)

The data collected from the GPS device allowed law enforcement to see where the Tahoe was at any point in time. (Tr. 79.) From the GPS data, law enforcement learned that the vehicle made frequent trips between the Burnsville apartment, an apartment in Woodbury, and two storage units. (Tr. 79.)

On April 12, 2022, law enforcement visited the two storage units – one in Woodbury (storage unit #444) and the other in Lake Elmo, Minnesota (storage unit #6001). (Tr. 59, 62.) Both storage units were rented by Defendant Lemoine. Staff at both locations allowed agents behind the locked gate into the open, common area lined with garage storage units. (Tr. 59–65, 93–94; *see* Gov't Exs. 14–18.) The storage unit garage doors were locked with padlocks. For each storage unit rented by Lemoine, officers wiped the door handle and lock with a small cotton disk (i.e., ion swab), which was then analyzed to determine whether they detected evidence of controlled substances (i.e.,

---

[8]    Government Exhibit 12 shows that Officer Gleason logged into the system at 5:02 p.m. for administrative purposes. (Gov't Ex. 12; Tr. 32.) In addition, there were two failed login attempts by Sergeant Weinzettel just before 8:00 p.m. (Gov't Ex. 12; Tr. 32–33.) Later, Agent Henkemeyer logged into the system at 10:32 p.m. and obtained the last known tracking location for the device on March 3, 2022, which was near the Woodbury apartment complex at 7:33 p.m. (Gov't Ex. 12; Tr. 33.) The Government represents in its post-hearing brief that it "does not intend to use any of the tracking data gathered on March 3, 2022, in its case-in-chief." (Gov'ts Mem. 15 n.16.)

through an ion scan).[9] (Tr. 52–54.) The swabs from the storage units yielded positive

results. (Tr. 68.)

On April 15, 2022, law enforcement returned to the Burnsville apartment building

where Defendant Lemoine rented unit #303. Management let the agents into the building

and provided them with keys to the common doors of the building. (Tr. 56–58.) The

agents went to the door for unit #303 and wiped the exterior door handle with an ion

swab. (Tr. 53, 68.) Like with the storage unit door handles, this involved taking a cotton

disc and rubbing it on the handle for several seconds. (Tr. 53, 94.) This cotton disc was

then analyzed for evidence of controlled substances and returned with a positive result.

(Tr. 53–54, 68.)

The above information was then used to obtain search warrants for certain

locations. (*See* Gov't Exs. 3, 4, 5, 6.) Specifically, on April 14, 19, and 20, 2022,

respectively, Sergeant Weinzettel submitted applications for search warrants and received

signed warrants for the Lake Elmo and Woodbury storage units, the apartment in

Burnsville, and the apartment in Woodbury. (Gov't Exs. 3, 4, 5, 6.) The warrants were

executed on April 21, 2022, and evidence was seized at all four locations. (*Id.*)

## DISCUSSION

The issues before the Court are (1) whether Defendant has met his showing for a

*Franks* hearing and, if no *Franks* hearing will be had, whether the search warrant

affidavit for the GPS tracking warrant on the gold Chevy Tahoe provided sufficient

---

[9]     Agent Henkemeyer testified that an ion scan tests for trace amounts of illicit narcotics. (Tr. 51.)

probable cause; (2) whether the evidence collected by the GPS tracking device should be suppressed due to a search conducted in violation of Defendants' Fourth Amendment rights, or whether the search warrant for the GPS tracker on the gold Chevy Tahoe was an independent source for the tracking data; (3) whether the ion swabs were improper warrantless searches in violation of Defendants' Fourth Amendment rights; and (4) whether, after any necessary redaction, the search warrants for the two apartments and the two storage units were supported by probable cause. This Court addresses each of these issues below.

## I.    *Franks* Hearing

A defendant may challenge the veracity of a search warrant affidavit offered in support of probable cause. *See United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). Defendants Martinez and Lemoine challenge the veracity of the GPS tracking warrant for the gold Chevy Tahoe and assert that a *Franks* hearing should be held to examine the issue further. (Doc. Nos. 81, 89.)

"To warrant a hearing on the affidavit's veracity, the defendant must make 'a substantial showing that the affidavit contains intentional or reckless false statements and [that] the affidavit, [if] purged of its falsities, would not be sufficient to support a finding of probable cause.'" *Id.* (alterations in original) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The Eighth Circuit has "applied [the] rationale [of *Franks*] to [also] cover material that has been deliberately or recklessly omitted from a search-warrant affidavit." *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir. 1993); *see also United States v.*

*Wilson*, 324 F. App'x 546, 547 (8th Cir. 2009) (applying the two-part test for omissions). When challenging a warrant based on an omission, the defendant must show "that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading" and that "the affidavit[,] if supplemented by the omitted information[,] would not have been sufficient to support a finding of probable cause." *Jacobs*, 986 F.2d at 1234 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

The substantial showing required for a *Franks* hearing "is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008); *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) ("The requirement of a substantial preliminary showing is not lightly met . . . ." (quotations omitted)); *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998) ("The substantial preliminary showing requirement needed to obtain a *Franks* hearing is not lightly met." (quotations omitted)). A defendant must "offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). "A showing of negligence or innocent mistake is not enough to establish a *Franks* violation." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). "A *Franks* hearing must be denied unless the defendant makes a strong initial showing of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quotations omitted). If a defendant makes the substantial showing necessary to entitle him to a *Franks* hearing, he must then prove his allegations before the Court will suppress evidence. *Jacobs*, 986 F.2d at 1234. If the defendant establishes by a

9

preponderance of the evidence "the allegation of perjury or reckless disregard" and, "with the affidavit's false materials set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* (quoting *Franks*, 438 U.S. at 155–56).

Defendants Martinez and Lemoine argue the warrant application for the GPS tracking device contained material misrepresentations and omissions. Specifically, they assert the application contained a misrepresentation about the date of the first observed meeting between the CI and the two suspects, stating it was in early March 2022, when Agent Henkemeyer testified that the first meeting took place on February 25, 2022. Martinez and Lemoine also assert there were misrepresentations about the specific location of the two men in the Tahoe as they arrived during the first meeting. The application states the driver stayed in the vehicle while the passenger got out and met with the informant, and then the passenger returned after the meeting to the driver's side of the Tahoe; Agent Henkemeyer testified that Martinez drove to the meeting, got out, and also drove away, implying that Lemoine was in the passenger seat the whole time. (Gov't Ex. 2; Tr. 15.) Similarly, the affidavit represents that on the day of the controlled buy, the driver got out and completed the transaction with the confidential informant. Agent Henkemeyer testified that Lemoine drove to that second meeting but it was Martinez (the passenger) who got out of the vehicle and completed the transaction in the front seat of the informant's vehicle. (Tr. 17.)

Martinez and Lemoine also argue that the application was misleading when it justified placing the GPS tracking device on the vehicle without a warrant because law enforcement was "previously unable to locate the suspects." (Gov't Ex. 2.) Defendants assert this implies that law enforcement had previously tried to locate the Tahoe, but they had not. They had only tried to previously locate a different vehicle – a 2006 blue Jeep Liberty. (*See* Gov't Ex. 1.) Defendants further argue that the application was misleading because it does not include information that law enforcement made any effort to determine the registered owner of the Tahoe before the March 2, 2022 meeting, when the earlier warrant application for the Jeep Liberty did state law enforcement's attempts to locate the Jeep and determine its registered owner. In addition, Martinez and Lemoine assert that the officers misled the judge by not telling the judge that they knew the identities of the two men at the time the application was made, and that they knew where at least one of them was living.

After full review of the search warrant affidavit at issue and the testimony provided, this Court finds that a *Franks* hearing is not warranted. *Franks* only "protects against [statements or] omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*" the reviewing judge. *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (emphasis in original) (citing *Reivich*, 793 F.2d at 961). There is nothing in the record that indicates that the information relayed in the affidavit at issue was designed to mislead or made in reckless disregard. First, based on the Government's clarification in its post-hearing brief, the date provided in the affidavit for the first meeting (i.e., March 2, 2022) was indeed correct, not false; Agent

Henkemeyer apparently misspoke about the exact date of the first meeting during his testimony. Second, even if the statements in the affidavit about who was sitting in which seat in the Tahoe was not correct, there is no evidence that these statements about who was sitting where was designed to mislead the judge in any way, nor were they made recklessly. And as explained further below, these particular statements in the affidavit are not relevant to the probable cause finding at all. Third, Defendants have not shown that the statement that law enforcement was "previously un[able] to locate the suspects" was made in reckless disregard either. This statement can be read broadly to mean that there have been times when the agents have not been able to locate the suspects, which is a true statement. Fourth, there is no evidence that omitting the fact that the officers now knew the suspects' names at the time the affidavit was submitted was designed to mislead. And as stated further below, whether the suspects' names were included or not makes no difference as to whether probable cause for the issuance of the warrant was present. Therefore, Defendants have not met their burden to warrant a *Franks* hearing because they have not shown that any of the challenged statements were designed to mislead or were made in reckless disregard.

Furthermore, even if the Court were to find that a deliberate lie or a disregard for the truth occurred by any of the above statements or omissions, a hearing is still not required because a defendant must also establish that a "corrected" or "supplemented warrant," (*i.e.*, the affidavit with the purportedly critical omitted information supplied and the purported falsehoods removed), would not have supported the existence of probable

cause.[10] *Reivich*, 793 F.2d at 962. Recklessness may only be properly inferred from an omission where the omitted material was "clearly critical to the finding of probable cause" or amounted to "flagrant police actions." *Id.* at 961 (quotations omitted); *see also Gonzalez*, 781 F.3d at 431 ("[R]eckless disregard for the truth may be inferred from the fact that . . . information was omitted," but "this inference is valid only when the defendant shows that the omitted material would be clearly critical to the finding of probable cause." (quotations omitted)).

In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

---

[10]    The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause existed.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

This Court concludes that the supporting affidavit for the GPS tracking warrant establishes probable cause.[11] In the affidavit, Sergeant Weinzettel states the following:

> In February 2022 your affiant received information from a Confidential Informant (CI) regarding the distribution of methamphetamine, cocaine, and marijuana within the City of St. Paul and surrounding metro areas.
>
> The CI stated they were an acquaintance of at least two members of the illegal narcotics organization and provided details of both current and past operations. Much of the initial information provided was able to be corroborated by Law Enforcement Officers. The involved organization was reported to be trafficking the narcotics from the South and Southwest United States to Minnesota as well as the transfer/transportation of illegal proceeds as a result of selling the narcotics.
>
> In early March 2022 your affiant and HSI SO Henkemeyer observed a meeting between the CI and one of the unidentified subjects. This meeting was to discuss the transaction for an amount of methamphetamine. During

---

[11]    Defendants do not specifically challenge whether the face of the warrant affidavit provides sufficient probable cause for the search; the argument is only implied by the fact that they argue a *Franks* hearing should be granted.

the meeting a H/M was observed arriving at the meet location and was the passenger in a **2007 Tan Chevrolet Tahoe (MN Plate HWK-799)** . . . . While the driver stayed in the vehicle the passenger met with the CI. After a brief conversation the subject entered the drivers seat of **2007 Tan Chevrolet Tahoe (MN Plate HWK-799)** . . . and the driver slid over to the passenger seat.

After the meeting your affiant received a telephone call from the CI who stated they had made arrangements for the illegal narcotics transaction.

Within the past 72 hours your affiant conducted a controlled purchase of an amount of methamphetamine. The meeting took place at a predetermined location where Law Enforcement Officers/Agents were prepositioned. After the arrival of the CI the **2007 Tan Chevrolet Tahoe (MN Plate HWK-799)** . . . was observed parking next to the CI. The driver got out of the Tahoe and made the transaction which was purchased with pre-recorded buy funds.

After both parties departed, your affiant met with the CI who turned over the purchased narcotics. A follow of the Tahoe was conducted by Law Enforcement Officer/Agents to an address in Burnsville MN (Dakota County). Due to previously being un[able] to locate the suspects your affiant had a **MECHANICAL MOBILE TRACKING DEVICE OR SYSTEM ON: 2007 Tan Chevrolet Tahoe (MN Plate HWK-799)** . . . . Your affiant is submitting this application at the first available opportunity and has not observed any electronic data resulting from it's [sic] installation.

After the device was placed[,] the vehicle was observed leaving the area and surveillance was terminated. Your affiant transported the purchased narcotics to officers of the St. Paul Police Department where it was tested. The presumptive test indicated a positive result for the presence of methamphetamine.

Because of the nature of the offense and because of the various times that the suspect is conducting the criminal offenses, physical surveillance is extremely difficult. In addition to providing evidence that may lead to the arrest and conviction of the suspect(s), the Electronic and/or Mechanical Mobile Tracking Device or System may provide evidence of the identities of other person with whom the suspect(s) may be involved in conspiring with to possess and sell illegal narcotics.

(Gov't Ex. 2.)

Here, even a "corrected affidavit"—i.e, one that fixes which Defendant was sitting where in the Tahoe, removes the statement that law enforcement was "previously unable to locate the suspects," and includes the information that law enforcement now have learned the suspects' names—would still have supported the existence of probable cause. Based on the facts provided, the affidavit still includes sufficient information about the CI (including that much of the information provided by the CI was corroborated), the controlled buy, the observation of the suspects, and the observation of the suspects' use of the Chevy Tahoe to conduct drug trafficking activities, which provides probable cause to believe that further evidence of drug trafficking activity would be found through the use of a GPS tracking device on the Tahoe. *See Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001) ("A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not."). Therefore, because probable cause for the search was present, Defendants have failed to make the requisite preliminary showing to warrant a *Franks* hearing. *See United States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010) (assuming information was intentionally or recklessly omitted from the search warrant affidavits, "[s]uch a finding alone is legally insufficient to justify a *Franks* hearing absent a determination that the intentionally or recklessly omitted information may have . . . otherwise made a probable cause finding unsupportable") (quoting *Williams*, 477 F.3d at 558).

Based on the above, this Court concludes that Defendants have failed to make a substantial preliminary showing that Sergeant Weinzettel included deliberately false or

reckless statements, or deliberately or recklessly omitted information, in the affidavit at issue. And, even if the statements challenged by Defendants are removed from the affidavit, and information about the Defendants' names is inserted, probable cause for the issuance of the warrants remains. Therefore, this Court recommends that Defendants' motions for a *Franks* hearing be denied.

## II.    GPS tracking device

Since this Court concludes that Defendants have not met the substantial showing needed for a *Franks* hearing and concludes that the GPS tracker warrant affidavit provides sufficient probable cause for the search, this Court turns next to Defendant Martinez's and Defendant Lemoine's argument presented in their separate motions to suppress GPS evidence. Defendants Martinez and Lemoine argue that the installation of the GPS device on the gold Chevy Tahoe on March 3, 2022, without a warrant, was a search in violation of the Fourth Amendment, and therefore the GPS tracking data, and its fruits must be suppressed.

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotations omitted). As a "supplement" to the Fourth Amendment, the Supreme Court created the exclusionary rule, which "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011). "Because the rule is

17

judicial in source, not constitutional, and is intended to deter government misconduct, evidence is not always excluded when the Fourth Amendment has been violated." *United States v. Powell*, 943 F. Supp. 2d 759, 765 (E.D. Mich. 2013).

Here, the Government does not dispute that a search occurred when the GPS tracking device was placed on the gold Chevy Tahoe.[12] *See United States v. Jones*, 565 U.S. 400, 404 (2012) (holding that law enforcement's warrantless installation of a GPS device on the defendant's vehicle and use of that device to monitor the vehicle's movements constituted an unlawful "search" for Fourth Amendment purposes). Instead, the Government asserts that the independent-source doctrine—an exception to the exclusionary rule—applies, and therefore Defendants' motions should be denied for that reason.

"Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search." *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013). A warrant obtained after an illegal search is an independent source if: (1) "police [would] have applied for the warrant had they not acquired the tainted information," and (2) "the application affidavits support probable cause after the tainted information has been redacted from them." *United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008).

---

[12]    The Government also does not challenge that Defendants Martinez and Lemoine had an interest in, or exercised exclusive control over, the gold Chevy Tahoe and therefore have standing to make a Fourth Amendment argument.

Here, it is undisputed that when the GPS tracking device was placed on the gold Chevy Tahoe at approximately 5:00 p.m. on March 3, 2022, it constituted an improper search. This Court concludes, however, that the subsequent search warrant obtained approximately two and a half hours later satisfies the independent source requirements. The first requirement is met because the warrant did not rely on tainted information. In fact, there was no tainted *information* that was acquired from the initial "search" (i.e., placement of the tracking device with the device being activated). The only information learned from the tracking device data retrieval system between 5:00 p.m. and 7:40 p.m. was that Officer Gleason logged into the system at 5:02 p.m. for administrative purposes, and that there were two failed login attempts by Sergeant Weinzettel just before 8:00 p.m. Although Agent Henkemeyer later logged into the system at 10:32 p.m. and obtained the last known tracking location for the device on March 3, 2022, that was done only after the new search warrant was signed.

Furthermore, nothing in the record indicates that the police were *not* going to apply for the GPS warrant if they had not already placed the tracker on the vehicle.[13]

---

[13]    Defendants Martinez and Lemoine argue that because the agents sought a GPS tracking warrant for the blue Jeep Liberty after they had observed the Defendants drive the gold Chevy Tahoe to the first meeting with the CI, that it shows that law enforcement did not intend to seek a GPS tracking warrant for the Tahoe. This argument is speculative and neglects the fact that the CI had told the officers that the CI expected them to arrive in a blue Jeep Liberty. It is more likely that the officers sought the first GPS warrant for the Jeep Liberty based on the CI's information, but then later intended to seek a warrant for a GPS tracker on the gold Chevy Tahoe after they had observed the Defendants in that vehicle twice. Further, the fact that the officers had not yet sought a GPS tracking warrant until after the controlled buy does not show that the officers were not intending to seek one.

Instead, the warrant affidavit states that Sergeant Weinzettel was "submitting [the] application at the first available opportunity and has not observed any electronic data resulting from it's installation," and that "[a]fter the device was placed the vehicle was observed leaving the area and surveillance was terminated." (Gov't Ex. 2.) The fact that tracking data had not yet been observed, that physical surveillance of the vehicle had been stopped at that time, and that law enforcement actually did seek and receive a signed warrant in less than three hours from when the GPS tracker was placed, supports the notion that the officers were intending to quickly obtain the new warrant without obtaining any tainted information.

In addition, the second requirement of the independent source doctrine has been easily met because there was no tainted information even included in the affidavit that could be redacted, and the affidavit included sufficient facts to support probable cause, as stated above.[14] Because both requirements are met, the search warrant for the GPS tracker on the gold Chevy Tahoe was therefore a valid independent source for the attainment of the tracking data. Thus, this Court recommends that Defendant Martinez's and Defendant Lemoine's motions to suppress the data collected by the GPS tracking

---

[14]    Defendants Martinez and Lemoine rely on their arguments made in support of their motions for a *Franks* hearing to support their assertion that the second requirement of probable cause was not met. As recommended above, Defendants' motions for a *Franks* hearing should be denied.

device, and the evidence later discovered at locations that the tracking data revealed, be denied.[15]

### III.    Ion Swab – Apartment Door

Defendant Martinez challenges the ion swab of the Burnsville apartment door handle, arguing that he had a reasonable expectation of privacy to the exterior apartment door and therefore a warrant was required for the search. The Government represents that it "does not intend to present any evidence obtained from the search of the Burnsville apartment," and therefore asserts the motion should be denied as moot. (Govt's Mem. 16.)

Based on the Government's representation that it will not offer evidence obtained from the Burnsville apartment at trial, this Court recommends that Defendant Martinez's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 56) and Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 44) be denied in part as moot as they relate to the Burnsville apartment door ion scan. Because this Court so recommends, this Court does not address the other arguments raised by the parties relating to the suppression of evidence resulting from the Burnsville apartment door ion swab, including the argument regarding Defendant

---

[15]    This Court also finds that exercising the exclusionary rule is not appropriate under these circumstances when the officers sought judicial authorization through a warrant within a matter of hours and data had not been extracted or observed until after the warrant was signed. *See United States v. Taylor*, 979 F. Supp. 2d 865, 877 (S.D. Ind. 2013) ("When, as here, law enforcement officers seek judicial authorization for their actions—a step that courts should not discourage—and they receive such authorization, it is objectively reasonable for them to believe that the authorized actions do not violate the Fourth Amendment.") (quotations omitted).

Martinez's standing. The issue of whether subsequent search warrant applications (i.e.,

for the search of the apartments in Woodbury and Burnsville, and the storage units in

Woodbury and Lake Elmo) are supported by probable cause when redacting any

information about the Burnsville apartment door ion scan results is addressed below.

## IV.     Ion Swab – Storage Unit

Defendant Lemoine challenges the ion swabbing on the two storage-unit door

handles and locks, arguing that he had a reasonable expectation of privacy to those

storage units and therefore a warrant was required for the search.[16] Specifically, Lemoine

---

[16]     Defendant Martinez references the storage units only in a subheading in his brief relating to the ion scan swabs. His argument, however, is focused solely on the swabs performed on the Burnsville apartment door handle, not the storage units. To the extent Defendant Martinez intended to challenge the ion swab of the outside of the storage units, this Court concludes that he does not have standing to do so.

"An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (quotations omitted). "Fourth Amendment rights are personal and may not be asserted vicariously." *United States v. Green*, 275 F.3d 694, 698 (8th Cir. 2001). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Russell*, 847 F.3d at 618 (quotations omitted). Factors relevant to standing include:

ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.* (quotations omitted). Here, it is undisputed that the storage units were rented by Defendant Lemoine. Defendant Martinez has not argued that he had any ownership or possessory interest in the storage units, and no evidence is before the Court indicating that Defendant Martinez had any expectation of privacy in the units. Therefore,

argues that storage units are like homes in that an expectation of privacy attaches, and that the outside of the storage unit is akin to the curtilage of a home, and that therefore the expectation of privacy covers that area as well. This Court disagrees.

"[T]he touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy" in the place in question. *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014) (quotations omitted). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351 (1967).

Here, the ion swabbing occurred on door handles and padlocks on the outside of rented storage units at commercial storage facilities, not at Lemoine's home. And the swabbing was done in a semi-public area—accessible to renters of other storage units, the management and staff of the facility, and individuals there by consent—after staff gave law enforcement permission to be there. Lemoine may have a reasonable expectation of privacy in the rented storage units and the contents inside those units, but he does not have an expectation of privacy in particles of contraband floating outside the storage units where law enforcement are permitted to be, just as the Supreme Court has held that one does not have an expectation of privacy in the scent of contraband. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("[A]ny interest in possessing contraband cannot be

---

Defendant Martinez has no standing to claim that the exterior doors of the storage units were searched illegally.

deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.'") (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). An ion swab on the exterior of a storage unit door that is not only located in an open-air lot but is accessible to all others who staff allow in, is not like a search of the curtilage of a home, but is more akin to a dog sniff on the outside of a storage unit. *See United States v. Taylor*, 979 F. Supp. 2d 865, 882 (S.D. Ind. 2013) (concluding that the dog sniff was not a Fourth Amendment search, stating that the dog sniff left everything in the storage unit "undetected except for the presence of narcotics," the presence of narcotics was detected from an area where police were allowed to be by an employee of the storage unit company, and the dog sniff "did not violate defendant's Fourth Amendment rights") (quotations omitted); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (holding that a dog sniff of a vehicle at a traffic checkpoint was not a search because it "does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics"). While the expectation of privacy in a storage unit is more than that in an automobile, it "is less for a storage unit than for a home." *State v. Carter*, 697 N.W.2d 199, 209 (2005) ("[F]or purposes of the Fourth Amendment, a person's expectation of privacy in a storage unit is limited because the unit is not a place where a person seeks refuge or conducts frequent personal activities."). As stated by the Supreme Court in *Illinois v. Caballes*, the relevant inquiry is whether the investigative device used is capable of detecting lawful as well as unlawful activity inside a place that otherwise carries a legitimate expectation of privacy. 543 U.S. at 409–10. The ion scan swabs here

24

only inform the officers whether narcotics are present; they do not indicate what other lawful items might be in the storage unit. *See Carter*, 697 N.W.2d at 209 (concluding "that a drug-detection dog sniff in the area immediately outside a self-storage unit is not a search under the Fourth Amendment"). Therefore, this Court concludes that Lemoine did not have an expectation of privacy to the outside of the storage units and the ion swabs at issue here did not constitute Fourth Amendment searches. Thus, Defendants' motions to suppress the evidence relating to these ion swabs and the evidence subsequently discovered should be denied.

### V.    Warrants

Finally, Defendants challenge the subsequent warrants issued for the searches of the apartments in Woodbury and Burnsville, and the storage units in Woodbury and Lake Elmo.[17] (Gov't Exs. 3, 4, 5, 6.) Defendants argue that if all information resulting from the GPS tracker and the ion swab results are removed from the warrant affidavits, then the information remaining is stale and provides no nexus between the location searched and the alleged contraband and therefore the warrants lack probable cause.

The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554,

---

[17]    Defendant Martinez challenges the two apartment search warrants, but does not raise a challenge in his post-hearing brief relating to the two storage units. (*See generally* Doc. No. 86.) Defendant Lemoine challenges the Burnsville apartment search warrant and both storage unit search warrants, but does not raise a challenge in his post-hearing brief relating to the Woodbury apartment, presumably because he has not established standing to challenge that apartment warrant. (*See generally* Doc. No. 87.)

557 (8th Cir. 2007). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. Courts should not review search warrants in a hyper-technical fashion. *Caswell*, 436 F.3d at 897. Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *Wajda*, 810 F.2d at 760.

As stated above, this Court recommends denying Defendants' motions relating to the suppression of evidence flowing from the GPS tracker and from the ion swab of the storage units. Therefore, the later issued warrants that included facts learned from the GPS tracker and from the storage unit ion swabs were not tainted and remain for the Court's consideration.[18] Because this Court recommends denying as moot the motion relating to the ion swab of the Burnsville apartment, this Court does not consider any statements about the Burnsville ion swab results in its probable cause determination.

This Court has reviewed the four subsequent warrants at issue and concludes that the affidavits supporting those warrants establish probable cause to search. The

---

[18]    Any fruit-of-the-poisonous tree argument that Defendants may be trying to make regarding the later search warrants fails because the "tree" was not "poisonous."

supporting affidavits contain facts about the investigation that started in February 2022 when law enforcement received information from the CI and also describe the surveillance in early March, including the controlled buy involving the two suspects (later learned to be Martinez and Lemoine). The affidavits also include information obtained through the GPS tracking of the gold Chevy Tahoe and the storage unit ion swab scan results discussed above. In addition, the affidavits include information that connect the suspected drug trafficking activity and Defendants to these four locations. This is true even when this Court does not consider the data learned from the ion swab of the Burnsville apartment door handle. Because this Court concludes that, based on the information provided in each search warrant affidavit, there was a fair probability that contraband or evidence of a crime would be found in the apartment in Woodbury, the apartment in Burnsville, the storage unit in Woodbury, and the storage unit in Lake Elmo, probable cause existed for the issuance of those warrants. Therefore, the evidence seized as a result of the execution of the search warrants need not be suppressed and Defendants' motions should be denied.[19]

---

[19]    With respect to all four of these additional warrants, even if probable cause did not exist, they were facially valid warrants, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not

# RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 44) be **DENIED IN PART AS MOOT** as it relates to the ion swab of the Burnsville apartment door handle, and otherwise **DENIED**;

2.      Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of a Tracking Device (Doc. No. 45) be **DENIED**;

3.      Defendant Lemoine's Motion for *Franks* Hearing (Doc. No. 46) be **DENIED**;

4.      Defendant Lemoine's Motion to Suppress Evidence Obtained as a Result of Searches Pursuant to Warrant (Doc. No. 47) be **DENIED**;

5.      Defendant Martinez's Motion for Hearing Pursuant to *Franks v. Delaware* (Doc. No. 53) be **DENIED**;

6.      Defendant Martinez's Motion to Suppress Evidence Obtained as a Result of an Ionscan (Doc. No. 56) be **DENIED IN PART AS MOOT** as it relates to the ion swab of the Burnsville apartment door handle, and otherwise **DENIED**;

7.      Defendant Martinez's Motion to Suppress Evidence Obtained after Execution of Search Warrants (Doc. No. 60) be **DENIED**; and

---

presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply to all four warrants. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable.

8.    Defendant Martinez's Motion for Suppression of Evidence Obtained in Violation of the Fourth Amendment of the United States Constitution (Doc. No. 61) be **DENIED**.

Date:  November 16, 2022          *s/ Becky R. Thorson*
                                    BECKY R. THORSON
                                    United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **November 30, 2022**. A party may respond to those objections by **December 14, 2022**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.